IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CATHERINE PENA, ) | CASE NO. 1:13CV01590 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE |
| ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. ) | |

Plaintiff Catherine Pena ("Plaintiff" or "Pena") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 11.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Pena filed her application for DIB on January 21, 2010, alleging a disability onset date of January 15, 2010.[1] Tr. 112, 114, 130-137. She alleged disability based on shoulder pain post-rotator cuff surgery extending to her neck and arms. Tr. 131. After denials by the state agency initially (Tr. 52-56) and on reconsideration (Tr. 60-65), Pena requested an administrative hearing. Tr. 66. A hearing was held before Administrative Law Judge Valencia Jarvis ("ALJ") on November 17, 2011. Tr. 25-49.

---
[1] Pena previously filed an application for DIB on September 14, 2009. Tr. 104.

1

In her December 30, 2011, decision (Tr. 7-24), the ALJ determined that Pena's residual functional capacity ("RFC") did not prevent her from performing work existing in significant numbers in the national economy, i.e., she was not disabled. Tr. 19. Pena requested review of the ALJ's decision by the Appeals Council. Tr. 6. On June 5, 2013, the Appeals Council denied Pena's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-5.

## II. Evidence

### A. Personal and Vocational Evidence

Pena was born in 1957 and was 52 years old on her alleged disability onset date of January 15, 2010. Tr. 18, 194. From December 1986 through January 2010, Pena worked as a clerk for the United States Postal Service. Tr. 132. In January 2010, Pena was granted disability through the United States Postal Service. Tr. 37.

### B. Medical Evidence related to Plaintiff's Physical Impairments [2]

**Shoulder pain.** Stephen Cheng, M.D., Pena's orthopedic surgeon, performed arthroscopic rotator cuff repair surgery on her right shoulder in 2006 and her left shoulder in 2007. Tr. 230, 646-48. In January 2008, Manhal A. Ghanma, M.D., examined Pena for the Bureau of Workers' Compensation. Tr. 406-409. Upon examination, he observed "evidence of slight limitation of full range of motion of both shoulders." Tr. 407. Dr. Ghanma stated that the limited range of motion was due to "pain complaints as opposed to actual physical limitation." Tr. 408. Dr. Ghanma concluded that Pena could return to work without restrictions. Tr. 408. In May 2008, an MRI of Pena's left shoulder showed mild impingement on the supraspinatus

---

[2] Plaintiff only challenges the ALJ's findings with respect to her physical impairments. Accordingly, only the medical evidence relating to those claims is summarized herein.

2

muscle tendon. Tr. 859. The radiologist opined that the findings were compatible with tendinosis/tendinopathy but could not exclude a partial thickness tear through the tendon. Tr. 860.

In June 2008 and January 2009, Pena presented to Jeffrey C. Kirschman, M.D., for an occupational medicine follow-up evaluation for her workers' compensation injury to her left shoulder. Tr. 789, 815. She also complained of persistent pain in both shoulders. Id. In January 2009, Dr. Kirschman diagnosed a "sprain shoulder, rotator cuff." Tr. 790. He also concluded that Pena had a 16 percent total impairment of the right upper extremity and a 15 percent total impairment of the left upper extremity. Id. In August 2009, Pena reported to Dr. Kirschman that she was having increased problems with left shoulder, down the left arm to the left hand with occasional weakness. Tr. 744. She stated that her shoulder pain also radiated into her neck. Id.

The next treatment note from Dr. Kirschman is from September 2011. Tr. 1042. Pena reported to Dr. Kirschman because "she has a hearing in [November] for social security disability…and lawyer advised her to be seen prior to this date." Id. Dr. Kirschman noted that Pena's complaints and pain pattern remained unchanged. Tr. 1043. Dr. Kirschman diagnosed Pena with a "sprain shoulder, rotator cuff" and noted that she should follow up in 6-12 months. Id.

**Back and neck pain.** In May 2008, an MRI of the cervical spine revealed mild bilateral neural foraminal bony stenosis at C4-5 and C5-6. Tr. 254. A repeat MRI in October 2008 demonstrated mild cervical stenosis at C4-5 and C5-6 with no neural foraminal stenosis. Tr. 858. In November 2008, Pena began treatment with Vasantha K. Kumar, M.D., due to chronic neck pain. Tr. 800. Dr. Kumar diagnosed cervical spondylosis. Tr. 803. He recommended physical therapy and prescribed a TENS unit and pain medications. Id.

In April 2009, Pena sought treatment with Anita L. Groeschke, N.P., for back pain. Tr. 771. Pena reported complaints of low back pain over the last year. Id. It was noted that Pena appeared to be in mild to moderate pain and walked with an antalgic gait. Id. An X-ray of her spine that same day showed disc degeneration at L1-L2 and L2-L3. Tr. 855. In August 2009, an X-ray revealed mild spondylosis at the C4 disk level and the rest of the disk spaces were noted as normal in height. Tr. 854. In December 2009, an MRI revealed bulging at L2-L3 causing moderate central canal stenosis and a small disc protrusion at T11-T12 and T12-L1 with minimal compression. Tr. 844.

In May and June 2009, Dr. Kumar performed left C5-C6 cervical facet joint medial branch blocks. Tr. 755-57, 764-65. It was noted in June 2009 that Pena had good relief from the previous injection for 6 weeks. Tr. 755. Six months later, in January 2010, Pena returned to Dr. Kumar reporting that she had good benefit from the diagnostic blocks but pain had returned in her neck without radiation to the arms. Tr. 717. Dr. Kumar noted that Pena appeared to be in mild pain with an antalgic gait. Tr. 718. Dr. Kumar diagnosed lumbar spinal stenosis, lumbar and cervical spondylosis, and myofascial pain. Id. In January and February 2010, Dr. Kumar performed joint medial branch blocks at L4-5 and L5-S1. Tr. 700-01, 712-13. In September 2010, Dr. Kumar performed a radiofrequency of facet joint medial branch blocks at L4, L5, and S1 bilaterally. Tr. 960. She noted that the previous injections were an excellent help. Id. In December 2010, Dr. Kumar performed facet joint medial branch blocks at L5-S1 bilaterally. Tr. 970.

**Migraines.** In January 2009, Pena was referred to Marc J. Friedman, D.O., for a neurology consultation to explore whether Botox injections could help with her migraines. Tr. 779-785. At that time, Pena reported that she was experiencing migraines 2-3 times a month

4

and missed 2-4 days of work per month due to the migraines. Tr. 779. Dr. Friedman diagnosed Pena with intractable migraines and, in January 2009, April 2009, July 2009, October 2009, and January 2010, he performed a series of Botox injections. Tr. 708-10, 732-33, 748-49, 767-68, 776-77. By the end of January 2010, Dr. Friedman determined that Pena was "not a Botox responder" and discontinued her Botox treatments. Tr. 709. In February 2010, Pena was seen by Dr. Friedman for a non-intractable migraine. Tr. 707.

In June 2011, Pena sent an email to Dr. Friedman reporting a worsening of her migraine symptoms. Tr. 1038. Pena was subsequently seen for this issue in August 2011 and was advised to increase her migraine medication. Tr. 1039. In October 2011, it was reported that Pena's headaches were less severe and she no longer needed to go to the emergency room due to her migraines. Tr. 1037-38. It was reported that her she was experiencing migraines once every 6 weeks or so at that time. Tr. 1037.

### C. Medical Opinion Evidence

**Dr. Das.** On March 29, 2010, state agency physician Elizabeth Das, M.D., reviewed the evidence of record and opined that Pena should be limited to light work with occasional overhead activities and should avoid heights and ladders due to her history of migraines. Tr. 862. On April 7, 2010, Dr. Das also completed a physical residual functional capacity assessment of Pena and found that Pena could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and/or walk for 6 hours in an 8-hour work day; sit for 6 hours in an 8-hour work day; engage in unlimited push/pull activities; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffold; and was limited in her ability to reach. Tr. 864-66.

**Dr. Kirschman.** On December 30, 2010, Pena's treating physician, Dr. Kirschman, completed a physical medical source statement on her behalf. Tr. 987-88. In his statement, Dr.

5

Kirschman opined that Pena had difficulties lifting and carrying because of "rotator cuff tears with poor surgical outcomes…" but did not experience difficulties in standing, walking, or sitting. Tr. 987. Dr. Kirschman further opined that Pena could rarely climb, stoop, crouch, crawl, and push/pull; occasionally balance, kneel, reach, handle, perform fine or gross manipulation; and frequently feel. Tr. 987-88. He also stated that she should be restricted from heights, moving machinery, and temperature extremes. Tr. 988. Finally, he stated that she does not need additional rest periods. Id.

On October 17, 2011, Dr. Kirschman completed a second MSS on Pena's behalf. Tr. 1035-36. The second MSS had the following changes from his first MSS:

- He again opined that Pena had lifting and carrying difficulties but specified in his second MSS that she could not lift/carry more than 10 pounds. Tr. 1035.

- He opined that Pena now could rarely balance, reach, handle, and perform fine or gross manipulation (in the first MSS he found that Pena could occasionally perform these activities). Tr. 1035-36. He also opined that Pena could rarely feel (in the first MSS he found that Pena could frequently feel). Tr. 1036.

- In the second MSS, he also added the additional restriction that Pena would need additional rest periods during the work day. Id.

- Finally, Dr. Kirschman specified that cervical degenerative disc disease, in addition to "shoulder/rotator cuff disease," supported his findings. Tr. 1035.

### D. Testimonial Evidence

#### 1. Pena's Testimony

At the administrative hearing, Pena was represented by counsel and testified that her most recent employment with the United States Postal Office ceased on January 15, 2010. Tr. 29. Pena testified that she stopped working at that time due to problems with both shoulders, migraines, and back pain. Tr. 30. Pena stated that she cannot stand or sit for longer than two hours without pain, cannot lift her arms above her shoulders, and has weakness in her hands. Tr.

6

30-31. She further testified that she must elevate her feet daily and could not lift more than 5 to 10 pounds up to waist level. Tr. 31-32. Pena stated that she treats her neck and back pain at a pain management clinic with nerve blocks. Tr. 34.

Pena also testified to having problems with migraines. Tr. 33. She stated that since she was 40 (she was 53 years old at the time of the hearing) she has experienced migraines twice a month which last 48 hours each. Tr. 35. She stated that, since her neurologist switched her medication four months prior, the migraines have been lasting about a week each time. Tr. 34-35. Pena testified that she missed work in the past due to her migraines. Tr. 36.

### 2. Vocational Expert's Testimony

Vocational Expert Mary Harris ("VE"), testified at the hearing. Tr. 42-48. The VE testified that Pena had past relevant work as a sales clerk (unskilled, light but performed at heavy) and a postal clerk (semiskilled, light but performed at heavy). Tr. 45. The ALJ asked the VE if a hypothetical individual of Pena's age, education, and work experience could perform Pena's past relevant work with the following characteristics: can lift up to 20 pounds occasionally, lift and carry up to 10 pounds frequently; perform unlimited pushing and pulling; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally perform bilateral overhead reaching. Tr. 45. The VE testified that such an individual could not perform Pena's past relevant work but could perform the following work: office helper (200,000 jobs nationally; 8,000 Ohio jobs); hand packager (200,000 jobs nationally; 19,000 Ohio jobs); and cashier II (1,000,000 jobs nationally; 56,000 Ohio jobs). Tr. 46.

Next, the ALJ asked the VE to assume a second hypothetical individual, similar to the first but with the following changes: the individual would have no restrictions on occasional or frequent lifting; could occasionally balance, kneel, and reach above shoulder or overhead

7

bilaterally; occasionally perform handling as well as fine and gross manipulation; perform frequent feeling; and would be restricted from exposure to heights, moving machinery, and temperature extremes. Tr. 46. The VE testified that the second hypothetical individual could not perform Pena's past work and could not perform any jobs under the Department of Occupational Titles.[3] Tr. 47.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a

---

[3] The VE testified that, based on her own experience, the second hypothetical individual could perform work as an electronics worker (10,000 jobs nationally; 1,000 Ohio jobs).

8

> severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her December 30, 2011, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013. Tr. 12.

2. The claimant has not engaged in substantial gainful activity since January 15, 2010, the alleged onset date. Tr. 12.

3. The claimant has the following severe impairments: degenerative joint disease of the cervical and lumbar spine, history of migraine headaches, impingement syndrome of the bilateral shoulders, status post arthroscopy, and sprain of the rotator cuff. Tr. 12.

---

[4] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

9

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[5] Tr. 14.

5.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can perform occasional climbing of ramps and stairs; can never climb ladders, ropes, or scaffolds; and can occasionally perform overhead reaching bilaterally. Tr. 14.

6.  The claimant is unable to perform any past relevant work. Tr. 18.

7.  The claimant was born [in 1957] and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. Tr. 18.

8.  The claimant has at least a high school education and is able to communicate in English. Tr. 18.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Tr. 19.

10. Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 19.

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 15, 2010, through the date of this decision. Tr. 20.

## V. Parties' Arguments

Pena contends that the ALJ erred in the following three ways. First, Pena argues that the ALJ violated the treating physician rule. Doc. 14, pp. 13-18. Second, Pena argues that the ALJ mischaracterized the medical evidence and Pena's testimony. Id. at pp. 18-20. Finally, Pena

---

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

10

contends that the RFC is not supported by substantial evidence because the ALJ posed an incomplete hypothetical to the VE. Id. at pp. 20-22. The Commissioner counters that substantial evidence supports the ALJ's disability determination. Doc. 15, pp. 6-11.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not violate the treating physician rule

Pena argues that the ALJ erred by giving "little weight" to the 2010 and 2011 opinions of her treating physician, Dr. Kirschman. Doc. 14, pp. 13-18. The Commissioner counters that substantial evidence supports the ALJ's determination that Dr. Kirschman's opinion was not entitled to controlling weight. Doc. 15, pp. 6-8.

Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the]

11

case record." 20 C.F.R. § 404.1527(c)(2). Conversely, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); (citing Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *2 (July 2, 1996)).

In his October 2011 opinion,[6] Dr. Kirschman opined that Pena could not lift/carry more than 10 pounds; could rarely balance, reach, handle, feel, and perform fine or gross manipulation; and that Pena would require extra breaks throughout the work day. Tr. 1035-36. Dr. Kirschman specified that cervical degenerative disc disease, in addition to "shoulder/rotator cuff disease" supports his findings. Tr. 1035.

Even though medical opinions and diagnoses of treating physicians are entitled to great weight, the ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001); *King v. Heckler,* 742 F.2d 968, 973 (6th Cir.1984)). In this case, the ALJ discussed Dr. Kirschman's October 2011 opinion and explained her reasons for giving little weight to that opinion. Tr. 17-18. The ALJ stated that Dr. Kirschman's opinion "is not confirmed by the weight of the objective evidence." Tr.18. For the reasons explained by the ALJ, which are discussed more fully below, the ALJ did not err in her determination that Dr. Kirschman's opinions were not entitled to controlling weight.

When a treating physician's opinion is not given controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with

---

[6] As discussed more fully in the medical evidence section, Dr. Kirschman's second MSS in October 2011 was more restrictive than his first MSS in 2010.

12

the record as a whole and is supported by relevant evidence, 20 C.F.R. § 404.1527(c)(2)-(6). Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include "good reasons ... for the weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor analysis. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). Good reasons "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406–407; Soc. Sec. Rul. 96–2p. Here, the ALJ provided "good reasons" for giving "little weight" to the opinions of Dr. Kirschman and those reasons are supported by substantial evidence in the record. In addition to the lack of objective support for Dr. Kirschman's opinions, the ALJ's decision made clear that she also discounted the opinions for the following reasons: (a) the infrequency of treatment and limited treating relationship with Dr. Kirschman and (b) the inconsistency of Dr. Kirschman's opinions with the record as a whole.

### a. Infrequency of treatment

The ALJ noted that Dr. Kirschman treated Pena infrequently. Tr. 18. A review of the treatment notes shows that Pena did not see Dr. Kirschman for two years from August 2009 through September 2011 and, when Pena saw Dr. Kirschman in 2011, as the ALJ pointed out, Pena reported to Dr. Kirschman at that time because "she ha[d] a hearing in [November] for social security disability…and lawyer advised her to be seen prior to this date." Tr. 16, 1042. At that time, Dr. Kirschman stated that Pena's complaints and pain pattern remained unchanged and advised her to follow up in 6-12 months. Tr. 16, 1043. Dr. Kirschman's treatment notes also reflected that Pena took no medication for her shoulder pain. Tr. 18.

### b. Inconsistency

The ALJ's decision also shows that he found Dr. Kirschman's opinions inconsistent with the record as a whole. The following evidence was inconsistent with the opinions of Dr. Kirschman: the ALJ's credibility analysis of Pena's symptoms, including her demeanor at the hearing; her conservative treatment; and the opinion of Dr. Das.

**Credibility.** The ALJ stated that Dr. Kirschman's opinions were not supported by objective medical evidence. Tr. 16-17. The ALJ apparently concluded that Dr. Kirschman's opinions were based on Pena's subjective complaints.[7] The ALJ found Pena's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they are inconsistent with the RFC. Tr. 15. The ALJ also specifically pointed out that Pena's demeanor at the hearing undermines her allegations as to the debilitating nature of her musculoskeletal impairments. Tr. 17. The ALJ states that he observed the following at the hearing:

> …[C]laimant was very demonstrative with her hands and arms when she described her duties at the post office job. While talking, she raised her right arm to shoulder height with seemingly no pain. The claimant did not appear to be in any discomfort when she moved her arms about.

Id. The ALJ's credibility determinations are entitled to great deference because the ALJ had the "unique opportunity to observe" the witness's demeanor while testifying. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001); *Jones v. Commissioner of Social Sec.,* 336 F.3d 469, 476; *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531. In this case, the ALJ's credibility determination is certainly entitled to great deference because it was based, in part, on actual

---

[7] In fact, a treatment note from Dr. Ghanma (who treated Pena for her shoulder injury prior to Dr. Kirschman) supports such a conclusion. Dr. Ghanma stated that Pena's limited range of motion was due to "pain complaints as opposed to actual physical limitation." Tr. 408.

observations of the witness during the hearing. Moreover, Pena does not challenge the ALJ's adverse credibility determination.

**Treatment.** The ALJ also found that Pena's treatment was inconsistent with the debilitating symptoms she alleged. As the ALJ noted, Pena admitted that she takes no prescription medication for her musculoskeletal pain and treats conservatively with injections. Tr. 16-18. In September 2010, Pena reported that her injections were an excellent help in reducing her pain. Tr. 960.

**Dr. Das Opinion.** The ALJ also gave great weight to the opinion of state agency physician Dr. Das's, which was inconsistent with the opinions of Dr. Kirschman. Dr. Das opined that Pena was limited to light work with occasional climbing of ramps and stairs; no climbing ladders, ropes or scaffolds; and occasional bilateral overhead reaching. Tr. 18. The ALJ found that Dr. Das's opinion was consistent with and supported by the record. The opinions of state agency physicians are entitled to consideration under the same regulations used to assess other medical opinions, and may in some circumstances be entitled to greater weight than the opinions of treating or examining sources. 20 C.F.R. §416.927(e); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 651 (6th Cir. 2006) (en banc) (affirming ALJ's decision adopting reviewing physician's opinion over treating physician's opinion).

Based on all of the above, the ALJ provided good reasons for discounting the opinions of Dr. Kirschman that were "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."[8] *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011); *See, e.g., Allen v. Comm'r of Soc.*

---

[8] Judicial review is limited to "whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied." *Elam ex rel. Golay v. Comm'r of Soc.*

*Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (finding that an ALJ provided good reasons for discounting treating physician opinion where the ALJ's stated reason was brief but reached several of the factors an ALJ must consider when determining what weight to give noncontrolling opinion).

### B. The ALJ did not cherry pick the record or mischaracterize evidence

Pena next argues that the ALJ erred by mischaracterizing the medical evidence and her testimony. Doc. 14, pp. 18-20. Specifically, Pena argues that the ALJ erred as follows: (a) by ALJ failing to evaluate her 2009 x-rays; (b) by taking her testimony out of context; and (c) by misinterpreting the medical evidence relating to her migraines. Id. at pp. 18-19. Pena states that, "Substantial evidence cannot be based on fragments of the record." Id. at pp. 19-20 (citations omitted). Accordingly, it appears that Pena is arguing that the ALJ cherry picked only favorable portions of the record. However, as noted by the Sixth Circuit, the so-called cherry picking of evidence by the ALJ "can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir.2009). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted). Moreover, Pena's arguments that the ALJ either failed to consider or mischaracterized evidence are without merit.

**X-Rays.** Pena argues that the ALJ failed to analyze her 2009 x-rays showing a degenerative spinal condition. The ALJ found that Pena's degenerative joint disease of the cervical and lumber spine constituted a severe impairment. Tr. 12. The ALJ specifically stated,

---

*Sec.,* 348 F.3d 124, 125 (6th Cir.2003); *Castello v. Comm'r of Soc. Sec.*, 5:09 CV 2569, 2011 WL 610590 (N.D. Ohio Jan. 10, 2011) *report and recommendation adopted sub nom. Castello ex rel. Castello v. Comm'r of Soc. Sec.*, 5:09 CV 2569, 2011 WL 610138 (N.D. Ohio Feb. 10, 2011).

"Objective test results, clinical findings, treatment records and reports from consulting sources establish the existence of the claimant's impairments." Id. In support of this statement the ALJ cited to various portions of the record including Exhibit 2F which contains the 2009 x-rays. Id. Accordingly, Pena's argument that the ALJ did not analyze this evidence is without merit.

**Migraines.** Pena also argues that the ALJ "misinterpreted" evidence regarding her migraines. Doc. 14, p. 19. The ALJ thoroughly discussed the evidence relating to Pena's migraines and Pena does not argue that the ALJ failed to review any specific pieces of evidence. Rather, Pena appears to take issue with the ALJ's determination that her migraines have decreased in frequency and are being controlled by medication. Id. In support of her argument that her migraines are not controlled, Pena relies on an October 2011 treatment note. Id. The ALJ acknowledged, discussed, and cited to this treatment note in his decision. Tr. 17. However, as the ALJ pointed out, that treatment note indicates that Pena's migraines were less severe and occurring less frequently. Id. Pena also argues that the ALJ did not recognize that her migraines were now lasting longer; however, that is inaccurate. When reviewing the medical evidence, the ALJ specifically acknowledged Pena's complaint of a "lengthening of her headaches" and acknowledged the fact that her medication dosage was increased. Id.

Contrary to Pena's arguments, the ALJ did not mischaracterize the evidence. Thus, Pena appears to be asking this Court to reweigh the evidence on this matter which this Court is not permitted to do. "The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner..." *Cordell v. Astrue,* 4:09-CV-19, 2010 WL 446944 at *17 (E.D. Tenn. Feb. 2, 2010)*; Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983); *Crisp v. Secretary, Health and Human Services,* 790 F.2d 450 n. 4 (6th Cir.1986). The ALJ had an adequate basis to conclude that Pena's objectively established medical condition was not so

17

severe that it could reasonably be expected to produce disabling pain and to discount her credibility to a degree as discussed more fully in the prior section. *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). For example, the ALJ pointed that, although in June 2011 Pena emailed her physician to report that her migraines were worsening, she did not see her physician regarding this complaint until October 2011. Tr. 17. Further, she provided no opinion evidence from a doctor that her migraines are disabling. The two MSS from Dr. Kirschman fail to even mention migraines as one of her disabling limitations. Tr. 987-88; 1035-36.

**Testimony.** Finally, Pena argues that the ALJ took testimony out of context regarding her standing limitations. In summarizing Pena's testimony, the ALJ stated, "The claimant alleged that she was unable to stand due to severe back pain." Tr. 15. Pena explains that the hearing testimony states, "I'm unable to stand for any long periods of time…" Tr. 30. Pena does not explain how the additional language would make a difference in this matter and, in fact, Dr. Kirschman found in both his 2010 and 2011 opinions that Pena had no standing, walking, or sitting limitations. Tr. 987, 1035. Accordingly, the ALJ did not take Pena's testimony out of context.

### C. The ALJ relied on a hypothetical which incorporated all of Pena's limitations that the ALJ found credible

Finally, Pena argues that the ALJ failed to incorporate the following functional limitations in his hypothetical to the VE: that she should be restricted to only occasional handling and performing fine and gross manipulation and would require at least 2 absences a month. Doc. 14, pp. 20-22. Plaintiff's argument lacks merit because "[h]ypothetical questions . . . need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec.*

*Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011)(citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Pena argues that her restrictions on handling and fine and gross manipulation activities are well supported by Dr. Kirschman's opinions. Doc. 14, p. 20. However, as noted in a prior section, the ALJ sufficiently explained why she gave little weight to Dr. Kirschman's opinions and Pena offers no other support for this limitation.

Pena also argues that the ALJ should have accepted a limitation that she would miss more than 2 days per month due to her migraines. Id. Pena argues that the record supports that her migraines last two days to one week each. Id. at p. 22. However, as noted in the prior section, the ALJ sufficiently considered limitations caused by Pena's migraines and found her statements regarding the limiting effects of this condition not credible. The ALJ's decision is supported by substantial evidence.

Thus, the ALJ appropriately relied on VE testimony in response to a hypothetical that incorporated the limitations that the ALJ determined were credible and supported by the record.

## VII.  Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: September 3, 2014

Kathleen B. Burke
United States Magistrate Judge